UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-160(16) (NEB)

UNITED STATES OF AMERICA,

      Plaintiff,

v.

KEON PRUITT
a/k/a "KenKen,"

      Defendant.

**GOVERNMENT'S SENTENCING POSITION**

> *"Whether it be from violence with guns, drug sales, a combination of both, we have been preyed upon enough as a community."*

- Concerned Community Member Who Fears Retaliation.

    For over 20 years, the Highs street gang attempted to hijack much of north Minneapolis. It converted public spaces into open-air drug markets, preyed on vulnerable youths, and normalized the regular sound of machinegun fire. Highs members glorified the gang at the expense of any other consideration. It was more important to shoot a rival gang member on sight—be it a public place, a drive-by shooting, or at a well-attended party—than to worry about killing innocent bystanders. The Highs criminal enterprise is a scourge on public safety.

    The Highs and Lows were engaged in a vicious war that resulted in death and destruction not only to combatants, but to innocent bystanders caught in the crossfire. Defendant Keon Pruitt was a shooter and soldier in that street war. Pruitt must account for the work he "put in" to benefit the Highs enterprise by carrying out robberies, burglaries, and shootings throughout the Minneapolis area. The Highs, with shooters

such as Pruitt, terrorized the community for years. The government respectfully submits that a life sentence is appropriate in this case.

## The Highs Criminal Enterprise

The Highs began laying claim to areas of north Minneapolis in 2004. Since that time, the Highs have dominated a large swath of north Minneapolis and its members have ruthlessly protected its turf. The Highs are engaged in a violent rivalry with the Lows. Each gang's moniker stems from its location—north or south—of West Broadway Avenue in Minneapolis:



*Figure 1: Overview of Highs and Lows Territories*

The May 2004 murder of Christopher Little, a known Lows member, proved to be a cataclysmic event in the history of the enterprise. Members of the Highs and Lows have engaged in hundreds of shootings and murders in their territories since Little's murder, which only serves to restart the circles of violence and revenge. The victims of

the violence were not only members or associates of the gangs, but also innocent adults and children who simply live within the gangs' territories.

Although the Highs enterprise consists of several "cliques," the gang's singular objective has remained the same: its members must "put in work" to promote, benefit, and enrich the gang. Highs members must commit acts of violence, procure firearms to facilitate the gang's activities, or engage in criminal activity such as fraud, robbery, or drug trafficking. The only other requirement is that members instill fear in rival gang members. Members of the Highs are expected to "hunt" rival gang members: an express directive to locate and kill rivals. Highs members also are expected to defend each other and to respond to any perceived disrespect from rival gangs. Highs and Lows gang members frequently take to social media to heighten their rivalry. Members of each gang post photographs trespassing in the other gang's territory or defacing the graves of murdered rivals. Highs members also frequently post images of themselves with money, drugs, and expensive items to gain respect. This glorification of gang life also serves to lure others into the lifestyle.

The Highs' existence depends on the success of the criminality of its members, which is comprised of a loosely defined and fluid hierarchy of (1) members who earned substantial respect from past criminality and receive a higher amount of the profits, host gatherings, and cover funeral expenses; (2) members focused on engaging in armed violent activity to protect Highs activities and target rival members; and (3) members focused on drug or weapons trafficking to further the ends of the criminal enterprise. Its members resort to any crime—murder, kidnapping, arson, robbery, bribery,

extortion, gambling, fraud, drug trafficking, arms dealing—so long as it glorifies the Highs enterprise or denigrates a rival gang.

Although its general credo has created violence in many parts of Minneapolis, a particular area within Highs territory acts as a representative microcosm of its activities. The Highs criminal enterprise runs rampant in the area of West Broadway and North Lyndale Avenue, including numerous businesses, and turned it into a de facto Highs headquarters:



*Figure 2: Intersection of West Broadway and North Lyndale Avenue in Minneapolis*

In fact, the Winner Gas Station has been openly referred to as "The Murder Station," "Murder Shop," or simply the "Murder," while the nearby Merwin Liquors and

Walgreens have been essentially open-air drug markets.[1] The Highs stranglehold on this area has been so tight that its members do not hesitate to flaunt their illegal activities openly:



*Figure 3: Highs Member Flaunting Currency Outside Winner Gas in Highs Territory*

The sheer amount of gun violence, drug trafficking, and other illicit activity demonstrate the extent to which the Highs have damaged the community. Between 2018 and 2023, in north Minneapolis alone—comprising both Highs and Lows territory—the statistics are staggering:

- 2,043 recovered firearms;
- 105 recovered switches;
- 7,997 "shots fired" calls;
- 20,265 ShotSpotter activations;

---

[1] This Walgreens location has since closed, in part due to the Highs activities in and around its location. This is a representative example of how the enterprise can affect the economic health of communities.

- 1,151 gunshot victims; and
- 155 homicides

The plague of opioids—and particularly fentanyl, a prime Highs product—requires no introduction. According to the Minnesota Department of Health, in 2022, Minnesota reported 4,228 non-fatal opioid-involved overdoses.[2] Unfortunately, overdose deaths in Minnesota due to opioid misuse has skyrocketed from 342 in 2018 to 1,002 in 2022.[3] Hennepin County alone experienced 378 opioid-related deaths in 2022, 94.7% of which were directly linked to fentanyl.[4] Beginning in approximately 2020, the Highs began actively contributing to this epidemic when it transitioned from marijuana sales as its primary moneymaker to instead peddling synthetic opioids.

Put simply, instead of getting gas at the local station or picking up prescriptions at the neighborhood Walgreens, residents near Highs territory live with the fear of being robbed, shot with a machinegun during a gang-related shooting, or losing a loved one to a fentanyl-related incident. The Highs criminal enterprise, fueled by the greed of its members and their thirst for power and respect, is a public health crisis.

---

[2]  Minnesota Department of Health, *Drug Overdose Dashboard,* last accessed 2/6/2024 at https://www.health.state.mn.us/opioiddashboard.

[3]  *Id.*

[4]  Hennepin County, *Overdose Epidemic*, last accessed 2/6/2024 at https://www.hennepin.us/opioid.

### Keon Pruitt's Offense Conduct

Defendant Keon "KenKen" Pruitt spent years as an active member of the Freeshotz and YNT cliques of the Highs criminal enterprise.[5] The Highs dubbed him "KenKen," and he had a reputation in the gang as a "shooter." His case represents the violent core of the Highs criminal enterprise, a group whose members glorified violence and measured loyalty by willingness to kill. Pruitt proved himself among the most dangerous and willing to participate in the gang's terror. He shot a rival gang member in the face, led police on a 120-mph pursuit in a stolen vehicle, and then joined a coordinated retaliatory attack that left an innocent man, Darryl Wells, dead. Pruitt's pattern of conduct, stretching across years, reveals a man unmoved by prior arrests or leniency, committed wholly to the gang's mission of domination through fear.

### Shooting of Lows Member Albert Lucas

On July 3, 2020, Pruitt shot Albert "AL" Lucas, a known member of the rival Lows gang, in the face outside Wally's Foods, a well-known Lows hangout. Surveillance video from Wally's Foods and Minneapolis Milestone cameras captured the shooting from multiple angles. *See* PSR at ¶ 46; Trial Exhibits F-3, F-3A, F-4, F-5, F-6, F-6A.

On that day, a black Hyundai Elantra with no license plates drove toward Wally's Foods. PSR at ¶ 46; Trial Exhibits F-1, F-2. At 3:31 p.m., Pruitt, who was seated in the rear driver's-side seat, extended his arm out the window and fired a handgun toward Lucas, striking him directly in the face. PSR at ¶ 46; Trial Exhibit F-3.

---

[5] As presented at trial, Pruitt made several admissions to his involvement in the YNT and Freeshotz cliques of the Highs. *See* Government Exhibits H-6

Early the next morning, the same Hyundai was involved in a high-speed pursuit in Monroe County, Wisconsin. PSR at ¶ 47; Trial Exhibit F-13. The vehicle, still bearing no license plates, fled law enforcement at speeds exceeding 120 miles per hour before it was stopped. *Id*. Officers identified Pruitt as the driver and confirmed his two passengers were fellow Highs members. PSR at ¶ 47; Trial Exhibit F-13A. The car had been stolen from a Minneapolis residence the night of July 2–3, 2020. *Id*.

A search of the Hyundai revealed a backpack belonging to Pruitt. Trial Exhibit F-10. Inside were several items, including a AAA card issued to a woman whose home had been burglarized the same night the car was stolen. *Id*. Forensic analysis matched Pruitt's fingerprints to prints recovered from an air conditioning unit at the burglary scene. PSR at ¶ 47; Trial Exhibit F-16.

Murder of Darryl Wells

On August 8, 2021, just one day after the killing of Highs member Prince Martin, Pruitt and several fellow Highs members executed a retaliatory attack against Darryl Wells at the Skyline Market, a known Lows gathering spot. The coordinated killing took six Highs members and associates, five firearms, four shooters, a total of three minutes from start to finish, and two get-away drivers – all with the intent to kill one innocent man who was not associated with any street gang. ECF No. 2301 (PSR) at ¶¶ 18, 20-25.

At 7:48 p.m., Wells parked at Skyline Market and entering the store. *Id*. at ¶ 21. Roughly a minute later, the Charger arrived and parked behind his car. *Id*. Co-defendants Dantrell Johnson and Gregory Hamilton exited the Charger and entered the market, moving down separate aisles as they searched for their target. *Id*. William

Johnson remained outside briefly, gesturing toward Wells's vehicle before moving toward the store entrance. *Id.*

Inside, Dantrell Johnson drew two firearms, confronted Wells, and opened fire. PSR at ¶ 22. Wells fell forward as bullets struck the floor and shelves around him. Hamilton, stationed near the front counter, pointed his gun toward Wells while William Johnson retreated to the Charger. *Id.*

Wells fled the store, running across Glenwood Avenue North toward the Porsche Macan, which was idling mid-street and driven by Pruitt. PSR at ¶ 23. As Wells ran, Pruitt accelerated, striking Wells with the Porsche before veering westbound on Glenwood. *Id.* Wells stumbled north across the street toward an alley. Trial Exhibits E-6, E-7. Meanwhile, Hamilton and Dantrell Johnson, now outside, continued firing at him before escaping in the Charger. *Id.*

Pruitt then made a U-turn on Glenwood and drove north on Morgan Avenue North, positioning his car near the alley where Wells had fled. Trial Exhibit E-11. There, juvenile shooter Christopher Johnson, Jr. exited the rear passenger seat, ran into the alley, and fired multiple rounds Wells. PSR at ¶ 234. Edward Washington also exited and fired toward Wells. *Id.* The juveniles re-entered the Porsche, and Pruitt sped them from the scene. Trial Exhibit E-11. Wells collapsed and died in the alley within minutes. *Id.*; E-14.

Police recovered the stolen Porsche that evening. PSR at ¶ 26. Blood found on the driver's-side exterior matched Wells's DNA, and Pruitt's fingerprints were identified on the steering wheel and rearview mirror. *Id.* at ¶ 26. Additional footage from Winner Gas and Salvation Army confirmed Pruitt's presence in the Porsche earlier on August

9

8. Trial Exhibits C-13, C-14. At 6:04 p.m., just before the murder, surveillance showed Pruitt entering the driver's seat, Washington in the front passenger seat, and Johnson, Jr. climbing into the rear. *Id.*

## The Appropriate Sentence

For these reasons, and as set forth below, the government respectfully urges the Court to impose a life sentence, the only punishment that satisfies the factors of 18 U.S.C. § 3553(a): to reflect the seriousness of the crime, promote respect for the law, provide just punishment, deter others, and most importantly protect the public from further harm.

### A. The Applicable Law

In following the sentencing methodology laid out by the Supreme Court, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Id.* at 49-50. Section 3553(a) requires the Court to consider a number of factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a). But a district court is not required to provide a mechanical recitation of the Section 3553(a) factors and "has wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater

weight than others in determining an appropriate sentence." *United States v. San-Miguel*, 634 F.3d 471, 475-76 (8th Cir. 2011).

### B. The Presentence Investigation

The Presentence Investigation Report calculated an advisory range of life imprisonment, and the facts fully justify such a sentence. PSR at ¶ 108. No departure grounds were identified, and none are warranted by the facts. *Id.* at ¶ 127. A life sentence is consistent with the Guidelines' assessment of the gravity of Pruitt's crimes, protects the public, promotes respect for the law, and effects much needed deterrence.

### C. The Guidelines

#### 1. Nature and Circumstances of the Offense

Pruitt was not a bystander to the violence the Highs criminal enterprise inflicted on North Minneapolis. He helped turn a neighborhood gas station and several convenience stores into battlefields and open-air drug markets. Pruitt stole cars and armed himself alongside other Highs members. Worst of all, he "put in work" as a shooter who enabled and executed gang retaliation, helped hunt a man through city streets, and caused innocent lives to pay the price for his actions. These were not spontaneous outbursts. They were coordinated, retaliatory acts of violence carried out by a self-styled "soldier" in a criminal enterprise that celebrates killing rivals and dominating public spaces.

The Lucas shooting was a drive-by head shot outside a neighborhood store executed in broad daylight, where several innocent bystanders, including a minor child, were present. The Wells murder was a six-person ambush: two gunmen flushing the victim from inside the market; Pruitt hunting him with a stolen Porsche on a public

11

street; and two juvenile triggermen deployed on foot to finish the job in an alley. The operation was captured on surveillance, corroborated by DNA and prints, and linked by matching casings to the earlier Morgan shooting that day. The brazenness of Pruitt's conduct: at a city market, in broad daylight, in traffic, using youths as shooters, reflects extreme disregard for human life and for the community's right to exist without fear. Every decision, from stealing the Porsche, arming the minors, and hunting perceived rivals, reflects calculation and utter disregard for human life.

The result was the death of an innocent man, the terrorizing of a neighborhood, and the further entrenchment of gang culture in North Minneapolis. These are precisely the kinds of crimes and consequences that warrant life imprisonment for racketeering murders.

### 2. History and Characteristics of the Defendant

Pruitt embedded himself in the Highs' Freeshotz and YNT cliques, publicly aligning himself via social media and repeatedly acting as a shooter/driver in violent missions. Trial Exhibit A-80; PSR at ¶¶ 18, 20-27. Pruitt's record reflects an unbroken allegiance to violence and criminality. PSR at ¶¶ 49-59. From his teenage years, he aligned himself with the Highs, celebrated his gang status on social media, and armed himself repeatedly. Trial Exhibit A-80. His adult convictions for drug and firearm possession, probation violations, and his current murder conviction show that prior interventions failed to deter him. PSR at ¶¶ 49-59.

Pruitt is intelligent and capable, yet he used those traits to further the gang's mission. *See* PSR at ¶¶ 83, 93. Even while incarcerated, he has been linked to additional violence against rival inmates—demonstrating that custody alone has not

12

extinguished his willingness to attack others.   PSR at ¶ 77.  His history underscores the ongoing threat he poses to the public.

### 3. The Need for the Sentence to Reflect Seriousness, Promote Respect for the Law, and Provide Just Punishment

The murder of Darryl Wells, a man wholly uninvolved in any gang activity, embodies the senseless brutality of this enterprise.  The choice to weaponize a car against a fleeing human being in the middle of a city street, then to release juvenile shooters to finish him in an alley, demands a severe response from the Court. Just punishment requires the heaviest sanction. Anything short of life minimizes the deliberate nature of the hunt and the catastrophic harm to a community already reeling from gang bloodshed.

Pruitt's conduct mocks the law: taunting rivals online, arming up, stealing cars for operations, and using city blocks as a battlefield.  Respect for the law requires accountability commensurate with harm.  A life sentence reaffirms that the law's protection of life is not negotiable, and that retaliatory, terrorizing violence will not be met with incremental punishment.

### 4. Deterrence—Specific and General

Pruitt escalated from armed association to aiding and abetting an execution-style homicide, completed in the end by two juveniles Pruitt drove to the scene.  Pruitt's pattern of escalation demonstrates that shorter sentences and probation have no effect. PSR at  ¶¶ 49-59. He offended while under supervision, fled police, and committed murder shortly after a prior conviction.  *Id*.  Only lifetime incapacitation reliably prevents his return to enterprise violence and the recruiting of still more youths into it.

The Highs thrived on spectacle and fear. Posting, boasting, and retaliating to project dominance. They glorified violence and measured loyalty in blood. A life sentence communicates clearly to this defendant, to his peers, and to his successors that brazen, open-air, disrespect for the law that takes human life and leaves entire communities shattered will be met with commiserate consequences. That message is essential to interrupt the calculus that glorifies violence as a path to status.

### 5. Protection of the Public

Public safety is paramount. The data from North Minneapolis tell a stark story: thousands of shots-fired activations, hundreds of gunshot victims, and a spiraling death toll—conditions materially aggravated by the Highs' campaigns. Removing a principal shooter/driver from the community reduces the operational capacity of the enterprise and protects rivals and innocents alike from the next retaliation. Pruitt has demonstrated ongoing dangerousness. There is no credible basis to assume risk abatement outside permanent incapacitation.

### 6. Avoiding Unwarranted Disparities

A life sentence aligns with the culpability of the highest-impact Highs offenders who plan, drive, and shoot and differentiates them from lesser participants. Anything less would invert proportionality by treating a hands-on enterprise shooter/driver more favorably than those with narrower roles.

## Conclusion

The Court must impose a sentence sufficient, but not greater than necessary to serve the purposes of sentencing. In a case defined by planned retaliation, public terror, and the murder of an uninvolved citizen, only life imprisonment satisfies the factors

outlined in 18 U.S.C. § 3553(a). Such a sentence reflects the seriousness of the offense, promotes respect for the law, provides just punishment, powerfully deters, and most critically protects the public from a proven, unrepentant enterprise shooter.

For all these reasons, the government respectfully submits that a Guidelines sentence of life imprisonment fully comports with the United States Sentencing Guidelines and the factors of 18 U.S.C. § 3553(a).

Dated: October 30, 2025                     Respectfully Submitted,


                                            DANIEL A. ROSEN
                                            United States Attorney


                                            */s/ Brian W. Lynch*
                                            Brian W. Lynch
                                            Trial Attorney
                                            Violent Crimes and Racketeering Section
                                            U.S. Department of Justice
                                            Washington, DC 20530